**ASTRAZENECA AB, et al.,**

v.

**MUTUAL PHARMACEUTICAL CO., INC.**

**Civil Action No. 00–4731.**

United States District Court, E.D. Pennsylvania.

Aug. 21, 2003.

See also 221 F.Supp.2d 535 and 250 F.Supp.2d 506.

Lisa B. Pensabene, Michael P. McGraw, Jacob K. Baron, Christopher P. Borello, Lisa Wang, Dennis Gregory, Fitzpatrick Cella Harper & Scinto, New York, NY, John V. Gorman, Morgan Lewis & Bockius, Eric Kraeutler, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Plaintiff.

Thomas S. Biemer, Dilworth Paxson LLP, Philadelphia, PA, Robert F. Green, Leydig Voit And Mayer Limited, Christopher T. Griffith, Leydig Voit & Mayer Ltd, Chicago, IL, John J. Higson, Dilworth Paxson LLP, Philadelphia, PA, for Defendant.

### MEMORANDUM

BAYLSON, District Judge.

The parties to this patent litigation have filed cross motions for summary judgment on May 2, 2003, relating to the Defendant's affirmative defense and counterclaim that the patent in suit, United States Patent 4,803,081 ("the '081 patent") is invalid. On August 19, 2002, following a *Markman* hearing, Judge Lowell A. Reed Jr. issued his Conclusions of Law regarding the construction of the patent claims at issue. *Astrazeneca AB v. Mutual Pharm. Co., Inc.*, 221 F.Supp.2d 535 (E.D.Pa.2002). The Court also denied Defendant's motion for reconsideration by Memorandum and Order dated October 3, 2002. *AstraZeneca AB v. Mutual Pharm. Co., Inc.*, No. Civ.A. 00–4731, 2002 U.S. Dist. LEXIS 20311 (E.D.Pa. Oct. 3, 2002). Thereafter, this matter was reassigned from the calendar of Judge Reed to the undersigned. On March 14, 2003, this Court granted the Plaintiffs' Motion for Summary Judgment of Literal Infringement, concluding that the Defendant, Mutual Pharmaceutical Company, Inc. ("Defendant") had infringed the '081 patent. *AstraZeneca AB v. Mutual Pharm. Co., Inc.*, 250 F.Supp.2d 506 (E.D.Pa.2003).

In addition to the cross motions for summary judgment that are now pending before this Court, Plaintiffs have filed a Motion to Exclude certain evidence and contentions, which, Plaintiffs claim, Defendant never disclosed during discovery, and only revealed for the first time, and belatedly, in conjunction with the present summary judgment motions. This Court heard oral argument related to all pending motions on July 31, 2003. For the reasons stated below, this Court will grant Plaintiffs' Motion to Exclude, deny Defendant's motion for summary judgment, and grant Plaintiffs' motion for summary judgment.

### I. Summary Background and Procedural History[1]

Plaintiff Aktiebolaget Hassle is the assignee of the '081 patent, which relates to "extended release" pharmaceutical preparations of active compounds having very low solubility. One such compound with low solubility in the intestines is felodipine, a cardiovascular drug, which Plaintiffs market under the brand name Plendil.

On June 6, 2000, Defendant filed an Abbreviated New Drug Application ("ANDA") seeking approval from the Food and Drug Administration ("FDA") to manufacture and sell Defendant's proposed 10 mg generic version of felodipine. Defendant amended its ANDA twice, to apply for approval of 5 mg and 2.5 mg dosages. Thereafter, on September 19, 2000, Plaintiffs filed this patent infringement suit, alleging that the proposed drug formulations in Defendant's ANDA infringe the '081 patent.

Defendant, in its Answer, raised the affirmative defenses of noninfringement and invalidity. Specifically, on the invalidity defense, Defendant claimed that "[t]he '081 patent, and each of the claims thereof, is invalid for failure to satisfy one or more of the requirements of 35 U.S.C. §§ 102,

---

1. The extensive procedural history and factual background of this case are set forth in this Court's March 14, 2003 Memorandum. *As-* *traZeneca AB v. Mutual Pharm. Co., Inc.,* 250 F.Supp.2d 506 (E.D.Pa.2003).

103 and/or 112." Defendant's Answer, Affirmative Defenses and Counterclaim ¶¶ 24. Defendant also asserted a two-count counterclaim, seeking declaratory judgments that its proposed formulations would not infringe the patent, and that the patent itself is invalid.

In granting Plaintiffs' motion and entering summary judgment of literal infringement, this Court concluded, based on Judge Reed's claim construction, and after comparing Defendant's proposed products, component by component, with the elements of the '081 patent's claims, that Defendant's formulations embody every element of claims 1, 8, 12, 14, 15 and 17 in Plaintiffs' patent [2]—and that no genuine issue of material fact remained as to Defendant's infringement.

## II. Judicial Determinations as to Patent Validity

■ The statute relating to patent validity and defenses to patent infringement actions provides:

> A patent shall be *presumed valid.* Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. . . . *The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.*

35 U.S.C. § 282 (emphasis added). The party asserting invalidity must show that the patent in suit is invalid by clear and convincing evidence. *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 725 (Fed. Cir.2002).

■ A challenger may rely on references to prior art in order to meet its burden. However, the challenger's burden is "especially difficult" when the Patent and Trademark Office ("PTO"), during patent prosecution, specifically considered the prior art references which the challenger is asserting in the litigation. *Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1467 (Fed.Cir.1990). Defendant in the present case cites to several separate prior art references, discussed in detail below.[3] Defendant asserts that the invention of the '081 patent is either anticipated by the prior art (under 35 U.S.C. § 102) or obvious (under 35 U.S.C. § 103).

### A. Anticipation

■ Anticipation simply means that the patent lacks novelty. *Brown v. 3M,* 265 F.3d 1349, 1351 (Fed.Cir.2001). A patent is anticipated if every limitation of the claimed invention is found in a single prior art reference. *Id.* The United States Court of Appeals for the Federal Circuit has observed that the tests for literal infringement and anticipation are "very similar," and that "[t]hat which would literally infringe if later in time anticipates if earlier than the date of invention." *Mycogen Plant Science v. Monsanto Co.,* 243 F.3d 1316, 1324 (Fed.Cir.2001) (*quoting Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747 (Fed.Cir.1987)). Stated simply, for a patent to be found anticipated by the prior art, "[t]here must be no difference between the claimed invention and

---

2. While Plaintiffs did not allege infringement of claim 1, in particular, because claims 8, 12, 14 and 15 were dependent on claim 1, this Court had to consider whether Defendant's products contained every element of claim 1, as a step in determining whether the dependent claims were infringed.

3. The two most important prior art references for purposes of the invalidity analysis in the present case—namely "Kawata" and "the German '106 patent," discussed below—were both disclosed to the PTO during prosecution.

the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991).

■ In some circumstances, though a prior art reference does not expressly set forth a particular element of the patent claim asserted to be anticipated, the reference still may anticipate if that element is "inherent" in the reference's disclosure. *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir.1999). The Federal Circuit has explained that

> This modest flexibility in the rule that "anticipation" requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges. It is not, however, a substitute for determination of patentability.

*Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed.Cir.1991). The party asserting anticipation can establish "inherency" only if the extrinsic evidence clearly shows "that the missing descriptive matter is *necessarily present* in the thing described in the reference." *Robertson*, 169 F.3d at 745 (*quoting Continental Can*, 948 F.2d at 1268) (emphasis added). Moreover, the "mere fact that a certain thing *may result from a given set of circumstances* is not sufficient." *Id.* (*quoting Continental Can*, 948 F.2d at 1269) (emphasis added). That is, inherency may not be established by mere "probabilities or possibilities." *Id.* This Court will discuss the doctrine of inherent anticipation in more detail, *infra*, in Part VII(A)(1)(c)(ii)[B].

■ An anticipation inquiry entails two analytical steps, the first of which is to construe the claims of the patent in suit, as a matter of law. *Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 714 (Fed.Cir.1998). This Court has already construed the claims of the '081 patent to the extent necessary to decide Plaintiffs' earlier motion for summary judgment of literal infringement. The second step in an anticipation inquiry is to compare the construed claims to the prior art. *Id.* Like infringement, the determination of whether a patent claim is anticipated is a question of fact and is susceptible to summary judgment only where no facts material to the question are disputed. *Id.*

### B. *Obviousness*

Another basis for a finding of patent invalidity, asserted by Defendant, is that the claims of the patent in suit are obvious. Not to be confused with anticipation, "obviousness" means that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

The correct inquiry is not whether each element existed in the prior art, but whether the prior art made obvious the invention of the patent in suit as a whole. *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d 1100, 1108 (Fed.Cir.1987).

■ To establish obviousness, the party asserting invalidity must make a showing of some "teaching, suggestion, or reason" in the prior art that would lead one of ordinary skill in the art to combine the various prior art references. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1348 (Fed.Cir.2000); *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed.Cir.1997) (stating that the "ab-

sence of such a suggestion to combine is dispositive in an obviousness determination"). The Federal Circuit has stated:

Evidence of a suggestion, teaching, or motivation to combine prior art references may flow, *inter alia,* from the references themselves, the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved. Although a reference need not expressly teach that the disclosure contained therein should be combined with another, the showing of combinability, in whatever form, must nevertheless be "clear and particular."

*Winner,* 202 F.3d at 1348–49 (citations omitted). *See also Crown Operations Intern., Ltd. v. Solutia Inc.,* 289 F.3d 1367, 1376 (Fed.Cir.2002) (noting that an obviousness finding cannot be based on the "hindsight" combination of components from various prior art references). This requirement of "combinability" presents a question of fact. *Winner,* 202 F.3d at 1348.

█ The determination of whether a patent claim is obvious is a conclusion of law based on underlying findings of fact. *Beckson Marine,* 292 F.3d at 725. These underlying factual inquiries are: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Id.* (*quoting In re Dembiczak,* 175 F.3d 994, 998 (Fed. Cir.1999)). Like anticipation, an obviousness determination entails two steps, the first of which is to construe the contested claims of the patent in suit as a matter of law. *Key Pharmaceuticals,* 161 F.3d at 714. The second step is to determine, as a

legal matter, whether the challenged claims would have been obvious, based on the four factual inquiries noted just above. *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.,* 183 F.3d 1347, 1353 (Fed.Cir. 1999). This Court may properly grant summary judgment on the obviousness issue only when those underlying factual inquiries "present no lingering genuine issues." *Beckson Marine,* 292 F.3d at 723.

### III. This Court's Construction of the '081 Patent[4]

█ For purposes of determining issues of invalidity, this Court must adopt the same construction of the '081 patent's claims as it adopted in determining the infringement issue. *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1330 (Fed.Cir.2003) ("It is axiomatic that claims are construed the same way for both invalidity and infringement."). In this litigation, Plaintiffs have asserted infringement of claims 8, 12, 14, 15 and 17 of the '081 patent, and this Court has found that Defendant has infringed those claims. Though Plaintiffs have not specifically asserted claim 1 of the '081 patent in this litigation, four of the asserted claims, namely 8, 12, 14 and 15, are dependent on claim 1, which contains the following limitations:

1. A solid preparation providing extended release of an active compound with very low solubility in water *comprising* a *solution or dispersion* of an effective amount *of the active compound in* a semi-solid or liquid nonionic *solubilizer,* wherein the amount by weight of the solubilizer is at least equal to the amount by weight of the active com-

---

4. While the bulk of this Court's claim construction is contained in Judge Reed's August 19, 2002 Conclusions of Law, Defendant later raised several additional issues of claim construction, which this Court decided in its March 14, 2003 Order, granting summary judgment of literal infringement.

pound, and a release controlling system to provide extended release.

United States Patent 4,803,081 (issued Feb. 7, 1989) (emphasis added).

The central issue of claim construction decided by this Court, in relation to Plaintiffs' previous motion for summary judgment of infringement, concerned the scope and meaning of the term "solubilizer." This Court held that "solubilizer," throughout the '081 patent, should be interpreted according to its "ordinary" meaning: a compound "that increases the solubility of a substance in a particular solvent." *Astrazeneca AB v. Mutual Pharm. Co., Inc.,* 221 F.Supp.2d 535, 548 (E.D.Pa.2002). Significantly, this Court found that the ordinary meaning of "solubilizer" includes both "surfactants" and "co-solvents." *Id.*

Whether the term "solubilizer" in the '081 patent includes co-solvents has been an important issue in this litigation, as Defendant's infringing products indisputably include the co-solvent polyethylene glycol 400 (herein "PEG 400"). *AstraZeneca AB v. Mutual Pharm. Co., Inc.,* 250 F.Supp.2d 506, 511 (E.D.Pa.2003). This Court has noted, and the parties have agreed, that PEG 400 *can* be used as a co-solvent solubilizer. *See id.* at 511 n. 2; Transcript of Oral Argument Hearing (Jan. 30, 2003) at 13–14, 57. Under this Court's claim construction, the term "solubilizer" in the '081 patent covers any co-solvent, within a particular drug formulation, if that co-solvent would function as a solubilizer within that formulation.

In claim 1 of the '081 patent, the solubilizer limitation can be found within the greater phrase: "a solution or dispersion of an effective amount of the active compound *in* a semi-solid or liquid nonionic solubilizer." Defendant argued, at the infringement stage, that the word "in" should be construed to mean "in and only in," such that the patent would be limited to a solution in which an effective amount of the active compound is dissolved *in and only in the solubilizer,* and in nothing else. The Court rejected that argument, and held simply that the limitation, "*in* a semi-solid or liquid nonionic solubilizer," includes "all solutions in which the active compound is dissolved or dispersed in a nonionic solubilizer." *AstraZeneca,* 250 F.Supp.2d at 515. The Court further found that an accused formulation would meet this claim element even though the alleged infringer had also added to the accused formulation some extra ingredient, such as, in Defendant's case, ethanol. *Id.* at 515 and 520.

## IV. The Prior Art

In their summary judgment briefings, the parties focus on the following prior art references and their impact on this Court's invalidity analysis.

### A. *The Kawata Patent*

In relation to Plaintiffs' earlier motion for summary judgment of infringement, the parties raised numerous arguments related to United States Patent 4,673,564 (inventors, Hiroitsu Kawata, et al.) (issued June 16, 1987) (herein "the Kawata patent").[5] The Kawata patent was of central importance in determining whether Defendant had infringed Plaintiffs' '081 patent.

---

**5.** Two of the prior art patents to be considered in this Memorandum were issued to the same inventor, Hiroitsu Kawata. The earlier of these two patents, United States Patent 4,412,986, was issued in 1983, while the later patent, United States Patent 4,673,564, was issued in 1987. In its moving papers, Defen-

dant refers to the later-issued patent as "Kawata II," and refers to the earlier patent as "Kawata I." Throughout this Memorandum, the Court will refer to the later patent simply as "the Kawata patent," and to the earlier patent as "the 1983 Kawata patent."

The Kawata patent relates to "a sustained release pharmaceutical composition of a solid medical material," such as nifedipine. *Id.* (col.1, ln.17). The Kawata invention encompasses several elements, including a "first component" and an optional "second component." *Id.* (col.1, lns.50–56, 66–68). Kawata suggests, only by way of example, that the second component may be a surfactant, or polyethylene glycol (i.e. PEG 400). *Id.* (col. 2, ln. 1; col. 5; ln. 65).

In its infringement determination, this Court found that the Kawata patent actually teaches away from the use of solubilizers. *AstraZeneca,* 250 F.Supp.2d at 513. As Kawata explains, the inventors "found that a sustained release pharmaceutical composition of nicardipine can be obtained by using amorphous nicardipine *without adding any substance improving the solubility in the intestines.*" United States Patent 4,673,564 (col.3, lns.49–52) (emphasis added). Thus, although examples of the second component include surfactants and PEG 400, Kawata's process does not necessarily make use of these substances *as solubilizers.* In construing the claims of the '081 patent, and in determining whether those claims have been infringed by Defendant's products, this Court has determined that the '081 patent and Kawata use "entirely different processes." *AstraZeneca,* 250 F.Supp.2d at 513.

### B. *The 1983 Kawata Patent*

In its present motion for summary judgment, Defendant also cites United States Patent 4,412,986 (issued Nov. 1, 1983) (inventors, Hiroitsu Kawata, et al.). This patent was issued in 1983, several years prior to the PTO issuance of United States Patent 4,673,564—"the Kawata patent" discussed above. The Court will refer to this earlier patent as "the 1983 Kawata patent," to distinguish it from the later Kawata patent.

The 1983 Kawata patent relates to "a novel nifedipine-containing solid composition having high bioavailability and small bulk for facilitating the administration thereof." United States Patent 4,412,986 (col.1, ln.13–15). While Defendant does not assert that the 1983 Kawata patent itself anticipates the '081 patent, Defendant cites to this predecessor of Kawata in connection with its argument that Kawata anticipates the '081 patent.

### C. *The German '106 Patent*

Defendant cites to a German patent, number DE 3400106 A1 ("the German '106 patent"), which relates to pharmaceutical preparations with a controlled drug release.[6] In its brief in opposition to Plaintiffs' present motion, Defendant, for the first time in this litigation, offers arguments and evidence related to the German '106 patent. Defendant never disclosed any contentions based on the German '106 patent at any time during the discovery, claim construction, or infringement phases of this litigation. As discussed below, Plaintiffs assert that Defendant's new contentions related to the German '106 patent should be excluded from consideration.

The inventors of the '081 patent—the patent presently in suit—actually cited to the German '106 patent in the Background section of the '081 patent. The inventors of the '081 patent seemingly recognized that the German '106 patent contains a solubilizer.[7] United States Patent 4,803,-

**6.** Foreign patents are capable of anticipating United States patents. 35 U.S.C. § 102(a), (b) and (d); *In re Kathawala,* 9 F.3d 942, 945 (Fed.Cir.1993).

**7.** Claim 1 of the German '106 patent, the only independent claim, covers

  1. Pharmaceutical preparations with controlled drug release containing:

081 (col.1, lns.62–64). But the '081 patent inventors attempted to distinguish the German '106 patent, on the ground that, in that foreign patent, the ratio of solubilizer to active compound is much less than 1:1, by weight, whereas the '081 patent requires that "the amount by weight of the solubilizer [be] at least equal to the amount by weight of the active compound." *Id.* (col.8, lns.47–50). *See also id.* (col.1, lns.62–64) (stating that German '106 "is described to use a solubilizer in an amount by weight to the active compound which is much less than 1:1").

In their present cross motions, the parties focus their arguments on Example 8 of the German '106 patent. In Example 8, according to Defendant, the solubilizer is polyethylene glycol 600 (herein "PEG 600"). Defendant offers an expert declaration (which Plaintiffs claim must be precluded as untimely) to prove that in Example 8, the amount of solubilizer (PEG 600), by weight, is greater than the amount of active compound (flufenamic acid), thereby meeting the weight ratio requirement of the '081 patent. Declaration of R. Christian Moreton, Ph.D. ¶ 34 (5/30/03). Moreover, Defendant asserts that the German '106 patent embodies every limitation of certain claims of the '081 patent, thereby rendering such claims invalid as anticipated.

### D. *Other Prior Art*

Defendant also cites United States Patent 4,369,172 (issued Jan. 18, 1983) (inventors, Schor, Joseph M., et al.) ("the Schor patent"). The Schor patent relates to "a carrier base material, consisting essential-

    a.) one or a plurality of natural and/or semisynthetic and/or totally synthetic physiologically compatible polymers,
    b.) one or a plurality of physiologically compatible lipophilic and/or hydrophilic solvents and/or swelling agents suitable for dissolving and/or swelling of the polymers,

ly or predominantly of hydroxypropyl methylcellulose having a chemical structure and molecular weight which renders it suitable for use in prolonged release therapeutic compositions." United States Patent 4,369,172 (col.1, lns.12–17).

Additionally, Defendant relies on, as prior art, an article written by D.A. Alderman, published in a technical journal in 1984: D.A. Alderman, *A Review of Cellulose Ethers in Hydrophilic Matrices for Oral Controlled–Release Dosage Forms,* Int. J. Pharm. Tech. & Prod. Mfr., 5(3) at 1–9 (1984) ("the Alderman article").

### V. The Parties' Contentions

Plaintiffs' Motion for Summary Judgment (Doc. No. 102) seeks dismissal of Defendant's affirmative defense and counterclaim of invalidity. Plaintiffs rely extensively on this Court's prior decisions, reviewed above, and also argue that because the prior art was submitted to the Patent and Trademark Office, not only do the Plaintiffs enjoy the statutory presumption of validity, and not only does the Defendant have the burden of proving invalidity by clear and convincing evidence, but also the burden is "most formidable." Plaintiff's Memorandum in Support of Its Motion for Summary Judgment at 14. Plaintiffs reiterate the arguments they made in the prior proceedings, that the Kawata patent teaches an entirely different process from that described in Plaintiffs' '081 patent, and that the '081 patent could not have been anticipated by Kawata because Kawata does not teach the use of a solubilizer.

    c.) one or a plurality of therapeutically active medications, and
    d.) optionally physiologically compatible vehicles and/or excipients.
German patent DE 3400106 A1 (claim 1) (translation procured by Defendant).

Defendant's Motion for Summary Judgment (Doc. No. 103) initially asserts that Judge Reed's decision on claim construction was too expansive, and that this Court's ensuing decision finding literal infringement was erroneous in part because it relied on and followed Judge Reed. The main thrust of Defendant's position, expressed at pages 23–43 of its opening brief, is that the prior art, particularly the Kawata patent, discloses each element of each asserted claim of the '081 patent. While Defendant expends great effort in arguing that each and every element of claim 1 is present in Kawata, the central issue presented is whether Kawata contains "a semi-solid or liquid nonionic solubilizer," as required by claim 1. If Kawata does not contain such solubilizer element, it cannot anticipate claim 1.

Defendant renews its earlier argument that, because Kawata mentions PEG 400 as an example of a substance that could comprise its optional "second component," and because PEG 400 is capable of functioning as a solubilizer under certain circumstances, this Court must find that Kawata embodies a solubilizer element. *See* Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.Brief") at 28. Defendant claims that its expert reports and experimental data reveal the unmistakable presence of a solubilizer function in Kawata.

Both sides filed two additional briefs, and substantial parts of their arguments are highly repetitive of their opening briefs.

Defendant's Memorandum in Opposition to the Plaintiffs' Motion is largely repetitive of its opening brief, arguing that the '081 patent's claims are invalid by virtue of the Court's claim construction and infringement decisions. However this brief, at page 34, brings a new theory into the case, that a foreign patent (here referred to as "German '106"), anticipates the '081 patent and renders it invalid. This argument, at this point in the litigation, is apparently the first time that the Defendant has asserted the German '106 patent in any detail.

Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment of invalidity (filed June 2, 2003) first argued that Defendant should be precluded from relying on new testing, theories and evidence not disclosed during fact discovery, not disclosed in response to contention interrogatories, and as to certain testing, not disclosed in the Defendant's experts' initial reports.[8]

Plaintiffs dispute that the Court's finding of literal infringement requires a finding of invalidity. Plaintiffs repeat their arguments from the claim construction and literal infringement stages of the case, that Kawata is an entirely different formulation system than the '081 patent, and also refute, at pp. 26–27, Defendant's assertion that PEG 400 acts as a solubilizer in Kawata. At pp. 27–36, Plaintiffs give their descriptions of the prior art, and refute Defendant's arguments that the prior art anticipates the '081 patent. Plaintiffs also assert that Defendant's argument that claims 14 and 15 are obvious, is insufficient.

Both parties then filed reply briefs on June 17, 2003. Plaintiffs' reply brief again

---

**8.** Because Plaintiffs' arguments for exclusion of certain evidence and contentions could not be analyzed based on the record then before the Court, the Court issued an Order on June 27, 2003 allowing Plaintiffs to file a Motion to Exclude, setting forth the reasons why any specific evidence or contentions should be excluded. Plaintiffs have since filed such a Motion to Exclude and Defendant has responded. This Motion is dealt with below at Part VI.

seeks exclusion of significant parts of Defendant's presentation on the cross Motions for Summary Judgment (including at pp. 43–48, reliance on the German '106 patent), disputes that Defendant has met its burden of producing clear and convincing evidence of invalidity, and repeats arguments made in the two prior briefs.

Defendant's reply brief asserts that it has not violated any court orders by submitting new evidence, asserts that Plaintiffs have acted inconsistently in this litigation, and ignore the effect of this Court's infringement decision on the issue of invalidity. Defendant argues that its own products use a co-precipitation process, and that, by virtue of the infringement decision, prior co-precipitation processes must also be encompassed by the asserted '081 claims, rendering the '081 patent claims invalid for anticipation. Specifically, Defendant also argues that Kawata is such a co-precipitation process, and discloses all of the elements of the '081 patent claims, including the solubilizer element.

## VI. Plaintiffs' Motion to Exclude

This Court entered an Order on June 27, 2003, allowing Plaintiffs to file a Motion to Exclude any factual materials or arguments relied on by Defendant in asserting invalidity, which Plaintiffs contend are improperly before the Court. Plaintiff did so (Doc. No. 113) and Defendant responded (Doc. No. 114).

### A. *Procedural History Related to Exclusion Issues*

#### 1. *Contention Interrogatories*

During the discovery phase of the litigation, both parties propounded interrogatories to the other seeking their contentions. It is undisputed that Defendant at no point ever asserted any detailed contention based on the German '106 patent. It is at least arguable that under Rule 26(e), De-

fendant was under an obligation to supplement its answers to contention interrogatories, because its prior answers, omitting any details of Defendant's contentions concerning the German '106 patent, were "in some material respect ... incomplete ..." Fed.R.Civ.P. 26(e)(1). By Defendant's failure to make Plaintiff aware of any reliance on the German '106 patent, Plaintiffs never had any reason to include the topic of the German '106 patent in its discovery strategy, or to include any questions about it in taking depositions, or in gathering its own evidence, or including the German '106 patent among the topics that Plaintiff discussed with its experts.

In its initial answers to contention interrogatories, Defendant listed the German '106, along with approximately 60 other patents, in support of its theories of invalidity, without any further description or discussion. Plaintiffs promptly moved for supplemental answers, asserting that Defendant was obliged to provide reasons why each of the listed patents proved invalidity. Although Defendant did supplement its answers in response to that motion, Defendant continued to assert, only in conclusory terms, that the German '106 patent was grounds for a finding of invalidity, but never disclosed any reasons or details in support of its contention. Plaintiff's Memorandum in Support of Its Motion to Exclude, Ex. G, at 6.

It must be noted that this Court never entered an Order providing that a party would be precluded from ever asserting a certain theory unless it was set forth in answers to contention interrogatories.

### 2. *Expert Reports and Expert "Declarations"*

It is first important to note the schedule for the submission of expert reports. On the issue of invalidity, Defendant was re-

quired to submit its opening expert report as of November 18, 2002. When it did so, it relied exclusively on the Kawata Patent and the Schor Patent, and served reports by Richard B. Silverman, Ph.D. and R. Christian Moreton, Ph.D. Plaintiffs responded with their expert report as of January 2, 2003. Defendant's reply expert reports were served on March 3, 2003 at which time Defendant additionally relied on the prior art article by Professor Alderman. Although the original Scheduling Order provided for expert depositions to follow the service of expert reports, both parties agreed to delay expert depositions, and they have not yet been taken.

When Defendant moved for summary judgment, pursuant to the pretrial schedule, on May 2, 2003, Defendant submitted a "Declaration" by Dr. Moreton dated May 1, 2003 (which included a "Declaration" by Dr. Silverman also dated May 1, 2003 as an attachment) (Doc. No. 103) which was substantively different from, and contained information not included in, the original expert report dated November 15, 2002. Although Defendant entitled this submission as a "Declaration," it is really a supplemental expert report, filed to support the Motion for Summary Judgment. This Court finds that such a filing was not contemplated by the parties or the Court in the pretrial schedule, and Defendant never moved for leave to supplement its prior expert reports.

Subsequently, when Defendant filed its brief in opposition to Plaintiffs' Motion for Summary Judgment on June 2, 2003, it submitted a further "Declaration" by Dr. Moreton dated May 30, 2003, which is substantively different from, and has additional material not contained in, Dr. Moreton's May 1, 2003 Declaration. (Doc. No. 104).

The most significant new material in the two May 2003 reports by Dr. Moreton relates to testing of PEG 400, supporting Dr. Moreton's opinion that PEG 400 acts as a solubilizer in Kawata. Declaration of Richard B. Silverman, Ph.D. ¶ 20; Declaration of R. Christian Moreton, Ph.D. ¶ 40 (5/30/03). This contention is discussed below. Dr. Moreton also renders an opinion on the impact of the German '106 patent. Declaration of R. Christian Moreton, Ph.D. ¶ 65 (5/30/03).

The expert reports served by Defendant on November 18, 2002, January 2, 2003 and March 3, 2003 did not contain any references whatsoever to the German '106 patent. Furthermore, when Defendant moved for summary judgment in its opening brief on May 2, 2003, there was no mention of the German '106 patent. The first time that Defendant raised the German '106 patent was in Defendant's opposition brief filed on June 2, 2003. Plaintiffs responded in their reply brief with surprise, anger and indignation, and objected to the Court considering the German '106 patent for any reason—which, inter alia, led to the Court requesting that this issue be raised by a separate Motion to Exclude.

The Moreton Declaration dated May 30, 2003 contains extensive reasons as to why the German '106 patent requires a finding of invalidity. Declaration of R. Christian Moreton, Ph.D. ¶¶ 39–71 (5/30/03). The substantive discussion on this point is reviewed in Part VII(A)(2) below. Defendant asserts that its reliance on the German '106 patent should be no surprise to Plaintiffs, however late it may be, because Plaintiffs' own patent application cited the German '106 patent. Defendant further asserts that because Plaintiffs did not provide an English translation to the German '106 patent with their patent application, they should be estopped from asserting any unfairness against Defendant in rais-

ing the German '106 patent, however belatedly.

At oral argument, when asked by the Court why Defendant had not disclosed any contentions or expert reports related to the German '106 patent, Defense counsel explained that, at the time when it answered contention interrogatories, all that Defendant had, related to the German '106 patent, was a German-language copy of that patent. Transcript of Oral Argument Hearing (July 31, 2003) at 11. Counsel further explained that, although Plaintiffs' '081 patent briefly refers to the German '106 patent, the '081 patent treated the foreign patent as though it were of no significance, and Defendant simply accepted the '081 patent's assertion "at face value." *Id.* Thus, Defendant did not expend the resources necessary to have the German '106 patent translated any earlier. Counsel remarked, candidly, "I mean there are only so many rocks that one can, you know, can turn over in litigation and that rock was not a rock that was uncovered until much, much later." *Id.* at 11–12. Specifically, it was not until after this Court's March 14, 2003 infringement decision that Defendant finally decided to procure a translation and see for itself whether the German '106 patent had any significance. As counsel explained, Defendant chose to look into the German '106 patent, after this Court found that Defendant's product infringes the '081 patent, because, at that point, Defendant was left with only an invalidity defense, and had to focus on the '081 patent itself—including its brief mention of the German '106 patent—to develop its invalidity arguments. *Id.* at 19.

Even assuming that it was the March 14, 2003 decision which gave Defendant the wake-up call to get moving on the German '106 Patent, the Defendant's contentions based on German '106 were still not contained in Defendant's opening brief filed on May 2, 2003. When the German '106 issue was first raised, in the Defendant's opposition brief filed on June 2, 2003, Plaintiffs had only fourteen days to respond, hardly a sufficient or fair amount of time in which to address a brand new issue in a case with a complex litigation history. Plaintiffs' counsel has indicated the prejudice that Plaintiffs have suffered by Defendant's belated attempt to inject the German '106 Patent into this litigation. If the matter had been raised earlier, then Plaintiffs could have taken fact discovery, could have asked Defendant's 30(b)(6) witnesses about the German '106 Patent, and could have developed opinions from their own experts to include in their expert reports. Defendant's principal response is that Plaintiffs could not have been prejudiced because they knew enough about the German '106 Patent to put a reference about it in the '081 Patent in 1987, but by not securing and providing the PTO with an English translation, Plaintiffs did not live up to their obligations. Plaintiffs respond to these arguments by asserting that they did not have an obligation to provide an English translation, and that if the PTO had a genuine interest in the German '106, it has its own translation facilities. The Court concludes that the Plaintiffs are the party most prejudiced, because they had no reason to believe that the German '106 patent was an issue in this litigation until it was too late to do anything about it.

In summary, no contentions about the German '106 patent were mentioned in Defendant's answers to contention interrogatories, in its expert reports exchanged as part of the pre-trial schedule, or as grounds for summary judgment in Defendant's Motion for Summary Judgment filed on May 2, 2003; neither did Defendant at any time move to supplement its interrogatory answers or expert reports.

### B. *Third Circuit Law on Exclusion as a Discovery Sanction*

In broad terms, Plaintiff's Motion to Exclude focuses on the German '106 patent and the new Kawata testing and expert reports. Analysis as to whether this evidence should be excluded depends on analysis of appropriate Third Circuit law. The law of this circuit is binding even though the Federal Circuit has jurisdiction over appeals in patent cases—although the cases within the Federal Circuit will be considered to the extent they do not contradict Third Circuit precedent.

Federal Rule of Civil Procedure 37(c)(1) provides that

A party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1), or *to amend a prior response to discovery* as required by Rule 26(e)(2), is not, unless such failure is *harmless,* permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1) (emphasis added). Preclusion can also result if a party violates a scheduling order, Fed.R.Civ.P. 16(f), or if an important contention or theory, for which expert testimony is needed, is omitted from expert reports. *Stein v. Foamex Intern., Inc.,* No. Civ.A. 00–2356, 2001 WL 936566, at *6 (E.D.Pa. Aug. 15, 2001) (precluding affidavit filed by plaintiff as attachment to its opposition to motion for summary judgment, where plaintiff had neglected to supplement expert opinions formally, through amended or supplemented expert report, in that plaintiff "would have the Court allow him to file preliminary expert reports and then freely supplement them with information and opinions that should have been disclosed in the initial report. That result would effectively circumvent the requirement for the disclosure of a timely and complete expert report.").

■ The most frequently cited Third Circuit case on this general issue is *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 905 (3d Cir.1977), *overruled on other grounds by Goodman v. Lukens Steel Co.,* 777 F.2d 113 (3d Cir.1985), in which the court set forth several factors for district courts to weigh in deciding whether to exclude evidence as a discovery sanction. The *Meyers* factors include

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Id.* at 904–05. An important final consideration is "the importance of the excluded testimony" to the proffering party's case. *Id.* at 904; *Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 302 (3d Cir.1991) (confirming circuit's "consistent position" that "the importance of the excluded testimony" is a factor); *Total Containment, Inc. v. Dayco Products, Inc.,* 177 F.Supp.2d 332, 341 (E.D.Pa.2001) (stating five-factor test, including four *Meyers* factors plus "importance" of evidence as fifth factor); *Gibson v. National R.R. Passenger Corp.,* 176 F.R.D. 190, 192 (E.D.Pa.1997) ("The importance of the excluded testimony is an important final consideration.").

The *Meyers* decision grew out of a civil rights action. The plaintiff alleged that the defendant home ownership association had discriminated against blacks in processing housing applications. At trial, the district court excluded two "key witnesses"

offered by the plaintiff on the ground that they were not listed in the plaintiff's pretrial memorandum. 559 F.2d at 903. These two witnesses—a land developer and a former president of the defendant association—would have testified that, in past years, blacks had unsuccessfully applied for housing with the defendant, and that the defendant had a reputation as an all white development. *Id.* at 904. Though these two witnesses were not listed in the plaintiff's pretrial memo, plaintiff's counsel had advised defense counsel of the new witnesses, after the pretrial memo was filed, and had invited any questions from defense counsel regarding their testimony. The trial court excluded the two witnesses' testimony and, following a bench trial, entered judgment for the defendant on the ground that the plaintiff had failed to prove discrimination. *Id.* at 897.

The Third Circuit in *Meyers* reviewed the exclusion decision for abuse of discretion, applying the factors set forth above. The Court of Appeals initially observed "how important such testimony might have been and how critical is its absence." *Id.* at 904. The court noted that the trial judge had made no finding of bad faith or motive to mislead the defendant. The excuse offered by plaintiff's counsel for his failure to list the witnesses was that he had not discovered them until after the pretrial memorandum was filed. The Court of Appeals found this to be apparently a bona fide representation. *Meyers,* 559 F.2d at 905. Weighing in favor of exclusion were the potential prejudice to the defendant and the possible disruptive effect of permitting the evidence. On balancing the various factors, the court held that the district court should have imposed "a less drastic sanction," and, thus, remanded the case. *Id.* The court stressed that the exclusion of "critical" evidence is an "extreme" sanction, "not normally to be

imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent." *Id.* (*quoting Dudley v. South Jersey Metal, Inc.,* 555 F.2d 96, 99 (3d Cir.1977)).

Though the court's opinion in *Meyers* has been overruled on other grounds (relating to limitations periods in civil rights cases), *Meyers* is still the leading case on exclusion as a discovery sanction in this circuit. Moreover, the Court of Appeals has noted that courts should continue to apply the *Meyers* analytical framework in tandem with an analysis under Federal Rule of Civil Procedure 37. *In re TMI Litigation,* 193 F.3d 613, 721 (3d Cir.1999).

In the recent case of *Quinn v. Consolidated Freightways Corp. of Delaware,* 283 F.3d 572 (3d Cir.2002), the ·Court of Appeals reversed a district court judgment on the ground that a discovery sanction imposed by the lower court denied the plaintiff the "opportunity to present critical evidence to the jury." *Id.* at 574. The *Quinn* case was a sex discrimination suit. The plaintiff had testified in a deposition regarding an incident of sexual harassment in a hotel room, involving an executive of the defendant, alone with the plaintiff. *Id.* at 575. Later, the plaintiff's coworker testified at a deposition that she had witnessed an incident, in a hotel room, involving the same executive and the plaintiff. *Id.* Less than a week before trial was set to begin, the defendant learned, from reviewing a time line exhibit prepared by plaintiff's counsel, that the plaintiff planned to testify about two separate hotel room incidents. The plaintiff's interrogatory responses had identified only one hotel room incident, and she had never amended her responses following the coworker's deposition, to allege a second hotel room episode. Defense counsel complained that the second incident was a "dramatic addition" and a "brand new alle-

gation," and should be excluded. *Id.* The trial judge refused to permit any questioning of the coworker regarding the second incident. The plaintiff lost at trial and appealed. *Id.*

The Court of Appeals in *Quinn* recognized that the coworker's testimony about the hotel room incident "was clearly probative, highly relevant, and it had the potential to provide strong support for plaintiff's case." *Id.* at 577. The court found it clear that defense counsel could not have been surprised by the plaintiff's last-minute disclosure of a second hotel room incident, in light of the coworker's deposition testimony about a second incident which she had observed. *Id.* The coworker's testimony inherently conflicted with the plaintiff's description of a hotel room incident, in which she was alone with the executive. In addition, any prejudice to the defendant from the coworker's testimony was neutralized by the defendant's ability to impeach the plaintiff based on the coworker's inconsistent description. *Id.* The court held that to "exclude critical evidence for failing to amend interrogatory answers under these circumstances champions form over substance and denied [the plaintiff] her full day in court." *Id.* at 578.

In the present case, having reviewed the applicable law, this Court will first determine whether, and to what extent, to exclude Defendant's evidence and theories related to the German '106 patent, and will then determine whether, and to what extent, to exclude Defendant's recent testing evidence related to Kawata.

### C. *Should Defendant Be Precluded From Relying on the German '106 Patent ?*

▮ Plaintiffs move for exclusion of the German '106 patent on the basis that Defendant never presented any evidence or theories as to that patent at any time

prior to its responsive summary judgment brief. Applying the *Meyers* factors to the overall facts in this case, exclusion of the German '106 patent is warranted.

Firstly, as to *Meyers's* prejudice prong, the Court notes that Plaintiffs must have known about the German '106 patent, at the time of the '081 patent application. Also, the German '106 patent appeared in Defendant's nondescript listing of patents in its interrogatory answers. However, Defendants did *not* list the German '106 patent when requested to state the reasons for reliance on prior patents. Plaintiff's Memorandum in Support of Its Motion to Exclude, Ex. G, at 6. Thus, Plaintiffs could not have predicted Defendant's eventual reliance on that foreign patent, and were surprised when Defendant did rely on it.

Plaintiffs urge that Defendant should be barred from asserting any theories not contained in its answers to contention interrogatories. Plaintiffs' strongest argument in this regard is the fact that Defendant requested, and secured, preclusion against Plaintiffs based on Plaintiffs' own failure to disclose their reliance on claim 10 of the '081 patent. Judge Reed agreed with Defendant and precluded Plaintiffs from relying on claim 10 because it had not been raised in response to contention interrogatories. *See Astrazeneca AB v. Mutual Pharm. Co., Inc.,* 221 F.Supp.2d at 543. Plaintiffs understandably assert that since Defendant seized on Plaintiffs' omission and secured a preclusion order, thus, under what has been referred to as a "culinary rule" (i.e., what is sauce for the goose is sauce for the gander), because Defendant sought and received benefit from Plaintiffs' omission, it is only fair for Plaintiff to benefit from Defendant's omissions.

However, the Court would not exclude a Defendant's evidence solely for this reason. First, the pretrial schedule adopted

by Judge Reed did not state that a party would be precluded from relying on theories that had not been set forth in its answers to contention interrogatories.

Moreover, Judge Reed's ruling was in the context of claim construction, whereas the parties are now debating cross motions for summary judgment on invalidity, which, if granted, against defendants, would terminate the case. However, Plaintiffs have been prejudiced because, in the absence of notice that Defendant was relying on the German '106 patent, and without notice of Defendant's supporting reasons, Plaintiff had no reason to take discovery, investigate, or include this topic in discussions with its own experts.

As to the second *Meyers* prong, the Court has considered whether any prejudice that would be caused by introduction of the German '106 patent into the case at this point can be cured. Because the German '106 patent is important evidence (see substantive discussion below at Part VII(A)(2)), this Court has considered allowing additional discovery on the German '106 patent and Defendant's theories in that regard, and time to allow Plaintiffs to obtain their own expert testimony on the foreign patent's significance, as well as the opportunity to file a renewed summary judgment motion. However, the Court concludes that such a procedure would not only reward Defendant's multiple violations of pretrial procedures, but would also not be fair to Plaintiffs, and would, further, seriously delay any resolution of this litigation, which is only one month short of its third anniversary.

To require Plaintiff to re-open depositions and attempt to secure fact discovery (and expert opinions), at this time, on a theory of invalidity based on the German '106 patent, would be decidedly unfair. The opportunity is gone to depose witnesses when their recollection and testimo-

ny are based upon their own knowledge of the facts and issues. Fact witnesses may now give more "result-oriented" testimony, this late in the litigation, after summary judgment briefs have been filed, and expert reports circulated. Thus the Court concludes that the prejudice to the Plaintiff cannot be cured.

Defendant has delayed, without any legitimate excuse, its own investigation of the German '106 patent. As noted above, the German '106 patent is mentioned in the '081 patent, and Defendant listed it in its initial answers to contention interrogatories. When Judge Reed's claim construction opinion was issued dated August 19, 2002, Defendant knew at that time that it had received an unfavorable ruling on claim construction, and was obliged to consider its impact on its theories in defending against infringement, and proceeding on its own claim of invalidity. In fact, the May 30, 2003 expert opinion of Dr. Moreton, at paragraph 32, notes that it was because of Judge Reed's construction of the '081 patent that the German '106 patent assumed a significance in the invalidity analysis. When asked at oral argument why Defendant did not proceed to investigation of the German '106 patent following Judge Reed's construction opinion, counsel implied that it was this Court's infringement decision dated March 14, 2003 that led to the inquiry. This is not a sufficient reason in view of the expert's report, as well as the common sense understanding of the impact of the claim construction on the validity issue.

This Court concludes that it was incumbent on Defendant, even if it could be excused for not asserting the German '106 patent in its answers to contention interrogatories, or in supplementing its prior answers, to have begun its investigation of the German '106 patent promptly upon a receipt of Judge Reed's claim construction

ruling, and to have included it in the expert reports exchanged in late 2002 and early 2003. Defendant never moved to supplement these initial reports, which would have at least put Plaintiff on notice that the issue would be presented on summary judgment. The issue was not even raised in Defendant's opening summary judgment brief.

Although permitting evidence of the German '106 patent would not disrupt the orderly and efficient trial of this case, because no trial date has been set, this factor is not really at issue here. The issue is not whether a witness can be called at trial, but rather whether a specific contention not asserted during discovery, or in expert reports, or in opening summary judgment briefs, should be considered if subsequently raised in the summary judgment process, and supported by expert "Declarations" filed six months late. To permit Defendant to introduce such a contention, when Defendant has offered no bona fide excuse for its dilatory conduct, would be simply to ignore the pre-trial scheduling orders and would cause the Court to extend the pre-trial proceedings into a fourth year.

Though Plaintiffs have not shown bad faith, the Defendant's oversight is not rationally explained and is surely prejudicial to Plaintiff. *See Trilogy Communications, Inc. v. Times Fiber*, 109 F.3d 739, 744 (Fed.Cir.1997) (noting that when scheduling orders are violated, "an opposing party is often prejudiced by the ensuing delay and resultant expense"). In *Trilogy*, the Federal Circuit upheld a district court's exclusion of expert testimony that supported the plaintiff's theory of infringement. Though the expert witness had submitted a report within the time period established by the district court, the report lacked certain information required under Fed.R.Civ.P. 26(a)(2), such as the identity of exhibits to be used in support of his opinions. The plaintiff thereafter submitted a second expert's report, a rebuttal report, and an affidavit by the expert, after the due date for expert's reports had passed. *Id.* The documents "contained new opinions and information and did not merely supplement the original report." *Id.* The district court excluded the supplemental reports to the extent they contained new opinions not found in the original report, as well as the expert's affidavit, which incorporated the new opinions. The Federal Circuit, applying the Fifth Circuit's framework for exclusion analysis,[9] which is remarkably similar to the Third Circuit *Meyers* framework, found no abuse of discretion. Quoting a Fifth Circuit precedent, the Federal Circuit observed that "[a]dherence to reasonable court deadlines is critical to restoring integrity in court proceedings. We will not lightly disturb a court's enforcement of those deadlines and find no reason for doing so here." *Id.* at 745.

Considering the Third Circuit and Federal Circuit precedent in this area, and all of the appropriate factors relating to sanctions under Rules 16 and 37, this Court will preclude Defendant from presenting its evidence and theories about the German '106 patent. It also must be noted that the leading Third Circuit cases cited above, *Meyers* and *Quinn*, involved individual plaintiffs, making civil rights claims. Courts are appropriately and necessarily indulgent to individual plaintiffs in cases

---

**9.** The Fifth Circuit framework consists of four factors: "(1) the importance of the excluded testimony, (2) the explanation of the party for its failure to comply with the court's order, (3) the potential prejudice that would arise from allowing the testimony, (4) the availability of a continuance to cure such prejudice." *E.E.O.C. v. General Dynamics Corp.*, 999 F.2d 113, 115 (5th Cir.1993).

such as *Meyers* and *Quinn*—but need not be so indulgent in patent cases such as the present one involving two large business entities, with expertise in their respective fields, and with highly competent counsel representing them. The Federal Circuit's decision in *Trilogy* is a more relevant precedent here.

The carefully orchestrated pretrial process was designed to flush out each party's contentions during discovery, so as to allow fact discovery, expert opinions, and dispositive motions, in that order. Allowing Defendant to assert an entirely new basis of invalidity at the very end of the process is simply not fair to Plaintiffs. *Stein v. Foamex Intern., Inc., supra.* Plaintiffs in this Court are entitled to resolution of the case in accordance with the pretrial schedule.

### D. *Defendant's New Testing and Expert Testimony Regarding Kawata*

██ Plaintiff also contends that certain newly-disclosed experimental data and expert testimony, purporting to show the inherent existence of a solubilizer in the Kawata patent, should be excluded due to Defendant's failure to disclose such evidence earlier.

The testing by Dr. Silverman, which is referenced in both of the Dr. Moreton reports, was intended to show the use of PEG 400 as a solubilizer in the Kawata patent. As defense counsel pointed out at oral argument, the testing done by Dr. Silverman, reflected in the May 1, 2003 and May 30, 2003 Dr. Moreton reports, was a continuum of testing that had been started by Dr. Silverman much earlier, and some of it was referred to in the opening reports by Dr. Silverman dated November 18, 2002, and in the supporting affidavit by Dr. Moreton dated November 15, 2002. The lab notebooks for Dr. Silverman show work beginning as of December 17, 2002, and continuing through April 28, 2003. Dr. Silverman's testing expanded on the Kawata-solubilizer premise by utilizing different chemicals and formulations over time.

The Court concludes that it would be unfair to allow Defendant to use and benefit from the testing done by Dr. Silverman and submitted after the final expert report on March 3, 2003. Defendant could offer no good reason at oral argument why this testing could not have been done earlier, and its submission as part of the reports dated May 1, 2003 and May 30, 2003 is entirely too late to allow Plaintiffs an adequate opportunity to contest it, rebut it or prepare their own tests. Transcript of Oral Argument Hearing (July 31, 2003) at 35–36. Further, Defendant did not file a motion to supplement its earlier reports or do anything to notify Plaintiffs about this new evidence. Although the object of the trial is to find the truth, enforcement of deadlines is sometimes necessary to preserve a level playing field.

Moreover, this evidence is not important to Defendant's claim of invalidity. Defendant will not be unduly prejudiced by this exclusion, because the general theory at the heart of the excluded data—namely, that PEG 400 increases the solubility of a given substance in another substance in Kawata—was to some extent developed in Defendant's opening expert reports. In considering the merits of the case, the Court will consider the Silverman testing and Moreton interpretation of that testing included in Defendant's earlier, and timely, expert reports, submitted as of November 18, 2002, January 2, 2003 and March 3, 2003.

An analysis under the *Meyers* factors supports this Court's decision not to allow Defendant's new Kawata evidence. Firstly, Plaintiffs are prejudiced by the new

Kawata information because Plaintiffs did not have any opportunity to adequately address this new and complex data and expert testimony. Secondly, the prejudice to Plaintiffs cannot be easily cured, considering that, even if this Court were to afford Plaintiffs more time in which to address the new data, Plaintiffs would be compelled to hire experts to perform testing, and as with the German '106 patent, discussed above, this would delay trial preparation and trial. Thirdly, permitting this new evidence would disrupt the summary judgment process. The parties have expended large resources in their cross motions for summary judgment, and are entitled to a decision based on the record established in accordance with an agreed court-ordered pretrial schedule. Finally, although Plaintiffs have not proven bad faith, Defendant surely could have requested a discovery extension in order to complete its experimentation. Defendant's ambush-like presentation of the new, untimely Kawata evidence persuades the Court that the only fair and reasonable result is total exclusion of that evidence.

Nevertheless, as shown below in Part VII(A)(1)(c)(ii), even if all of Defendant's newest evidence were introduced, Defendant would not be able to show the inherent presence of a solubilizer in the Kawata invention—which is essential to Defendant's theory that Kawata anticipates the '081 patent.

In sum, Defendant will be limited to the theories of invalidity it asserted in its answers to contention interrogatories, and in its timely expert reports and opening summary judgment brief. Defendant will not be allowed to rely on the German '106 Patent because it was not timely asserted as a reason for invalidity; Defendant will not be allowed to rely on new data in the Declarations of Dr. Moreton or Dr. Silverman dated May 1, 2003, or the Moreton Declaration of May 30, 2003, submitted along with the summary judgment briefing, because these "Declarations" are in reality expert reports and the deadline for Defendant's expert reports was March 3, 2003, as to reply reports.

## VII. Cross Motions for Summary Judgment

In their cross motions for summary judgment, the parties address two general theories of invalidity, namely, anticipation and obviousness. This Court will first consider each of the issues presented under Defendant's anticipation theory.

### A. *Anticipation*

Plaintiffs argue that Defendant cannot succeed in proving, by clear and convincing evidence, that any of the asserted claims of the '081 patent are anticipated by the prior art. To determine whether Defendant could prevail on its anticipation theory, it is necessary to consider each of Defendant's anticipation arguments separately.

### 1. *Comparison of the Kawata Patent to the Claims of the '081 Patent*

■ In this litigation, Plaintiffs have asserted claims 8, 12, 14, 15 and 17 of the '081 patent, and this Court has found that Defendant has infringed those claims. Although Plaintiffs have not specifically asserted claim 1 of the '081 patent in this litigation, four of the asserted claims, namely 8, 12, 14 and 15, are dependent on claim 1. Therefore, to determine whether any of these dependent claims are anticipated by the prior art, it is necessary to first determine whether claim 1 itself is anticipated.

In arguing anticipation of claim 1, Defendant relies most heavily on the Kawata patent. While Defendant expends great effort in arguing that each and every element of claim 1 is present in Kawata, the

central issue presented is whether Kawata contains "a semi-solid or liquid nonionic solubilizer," as required by claim 1. If Kawata does not contain such solubilizer element, it cannot anticipate claim 1.

Defendant renews its earlier argument that, because Kawata mentions PEG 400 as an example of a substance that could comprise its optional "second component," and because PEG 400 is capable of functioning as a solubilizer under certain circumstances, this Court must necessarily find that Kawata embodies a solubilizer element. *See* Def. Brief at 28.

### a.) Defendant's Claims of Inconsistency and Admissions in Plaintiffs' Statements

Defendant accuses Plaintiffs of maintaining inconsistent positions regarding the possible presence of a solubilizer in Kawata. *See* Def. Brief at 17–21 and Defendant's Reply Memorandum ("Def.Reply") at 3–8. Defendant points out that Kawata teaches two separate embodiments, involving "milling" (or "micronizing") and "co-precipitation," respectively. Defendant asserts that any "teaching away" from solubilizers in Kawata is limited to the "milling" embodiment. Moreover, Defendant contends that Plaintiffs have recently admitted that Kawata has no "blanket" ban on solubilizers. Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Opp.") at 18.

In Plaintiffs' brief in support of their present motion, Plaintiffs wrote: "With regard to the *micronizing embodiment,* Kawata says 'a sustained release pharmaceutical composition of nicardipine can be obtained by using amorphous nicardipine without adding any substance improving the solubility in the intestines.'" Plaintiff's Memorandum in Support of Its Motion for Summary Judgment at 19. Defendant

suggests that, because Plaintiffs phrased a single sentence of its argument this way, Plaintiffs have tacitly recognized that the Kawata co-precipitation process may require a solubilizer. But Defendant ignores the fact that, on the very same page of their brief containing the above statement, Plaintiffs flatly assert, as they always have, that "Kawata does not teach the use of solubilizers." *Id.* Indeed, Plaintiffs have unambiguously asserted, throughout this litigation, that Kawata does not utilize a solubilizer.

Defendant argues that, if Plaintiffs had "come clean" earlier in this litigation, by admitting that Kawata only teaches against solubilizers with respect to its milling embodiment, this Court would have concluded that Defendant had not infringed the '081 patent. Def. Opp. at 19. Defendant's presumption as to what this Court would have decided regarding infringement—if Plaintiffs had identified the distinction between Kawata's two embodiments—is without foundation. This Court (including Judge Reed in relation to claim construction) conducted its own examination of Kawata and concluded that the Kawata patent, as a whole, taught against the use of solubilizers. This Court would not necessarily have come to the opposite conclusion, had Plaintiffs' counsel emphasized the distinction between Kawata's two embodiments. Indeed, Defendant has, in previous stages of this litigation, pointed out to the Court that Kawata has two separate embodiments, and has argued that the co-precipitation embodiment "does not teach against the use of solubilizers." *AstraZeneca AB v. Mutual Pharm. Co.,* 2002 U.S. Dist. LEXIS 20311, at \*8 (E.D.Pa. Oct. 3, 2002) (denying reconsideration of claim construction decision). Nevertheless, the Court determined, in its claim construction and infringement deci-

sions, that Kawata, as a whole, taught against the use of solubilizers.

In sum, Defendant's claims that Plaintiffs have taken inconsistent positions as to the possibility that Kawata may contemplate a solubilizer, are without merit.

### b.) Absence of an Explicit Solubilizer Component in Kawata

Defendant apparently acknowledges that the Kawata patent contains no explicit reference to any solubilizer component. Def. Brief at 23 (beginning Defendant's entire anticipation argument with a general discussion of "inherency"). The only express language in Kawata that could be construed as referring to solubilizers is the explanation, with respect to one of Kawata's two embodiments, that the Kawata invention can be employed *"without adding* any substance improving the solubility in the intestines." United States Patent 4,673,564 (col.3, lns.49–52) (emphasis added). This statement does not teach the use of solubilizers. Accordingly, no genuine issue of material fact exists as to the absence of any explicit solubilizer component in Kawata.

### c.) Defendant's Failure to Demonstrate an Inherent Solubilizer Component in Kawata

Because Kawata does not explicitly require a solubilizer, the only way that Defendant can succeed in showing that Kawata anticipates claim 1 of the '081 patent is via the doctrine of "inherency." As explained above, in certain rare cases, although a prior art reference does not expressly set forth a particular element of the patent claim asserted to be anticipated, that prior art reference may still anticipate if the particular element is "inherent" in the reference's disclosure. *In re Robertson,* 169 F.3d 743, 745 (Fed.Cir.1999). A finding of inherency is proper only if the missing element is "necessarily present" in the prior art reference. *Id.*

### i.) *Defendant's Argument Based on the 1983–Kawata patent*

Defendant asserts that PEG 400 inherently acts as a solubilizer in Kawata because it "increases the solubility of nifedipine in PVP [polyvinyl pyrrolidone]" in Kawata. Def. Brief at 30. Defendant cites to the older 1983–Kawata patent as evidence that this is so. The 1983–Kawata patent requires several components, including a "2nd substance," which may be PEG 400. The inventors of the 1983 Kawata patent explained, in the patent's specification, that the second substance acts to increase the solubility of nifedipine in another substance, which can be, for example, PVP. United States Patent 4,412,986 (col.3, ln.14–17).

This reference in the 1983 Kawata patent to a function performed by PEG 400 in that patent cannot suffice to demonstrate that the later Kawata patent *necessarily* uses PEG 400 as a solubilizer. While the specification of the 1983 Kawata patent confirms that PEG 400 *can* be used as a solubilizer under certain circumstances—such as in the formulations disclosed in the 1983 Kawata patent—this amounts only to a showing of "probabilities or possibilities" regarding the function of PEG 400 in the later Kawata patent. *See Robertson,* 169 F.3d at 745. Such a showing is insufficient to establish inherency. Moreover, Defendant has cited no legal authority to support its implicit argument that, simply because the two Kawata patents contain certain similarities, the Court should read into the later Kawata patent an element that was present in the 1983 Kawata patent, but omitted from the specification of the later Kawata patent.

**ii.) *Defendant's Experimentation and Expert Analysis***

Defendant next asserts that its own recent experiments, purportedly based on the Kawata patent, reveal that, in Kawata, PEG 400 "would function to increase the solubility of nifedipine in DCM [dichloromethane]." Def. Brief at 30. *See also* Declaration of Richard B. Silverman, Ph.D. ¶ 20; Declaration of R. Christian Moreton, Ph.D. ¶ 40 (5/1/03). DCM is a volatile organic solvent disclosed in Kawata.

Plaintiffs argue that, even if Defendant's experiments prove that PEG 400 can increase the solubility of nifedipine *in DCM,* that would not make PEG 400 a claimed "solubilizer" as that term has been construed by this Court within the context of the '081 patent; that is, Plaintiffs claim that a substance can only be a claimed solubilizer if it increases the solubility of another substance *in water.* However, this Court has simply held that "solubilizer" means a compound "that increases the solubility of a substance in a particular solvent." The Court never stated that such particular solvent must be water. Thus, Plaintiffs' argument is unavailing.

Plaintiffs also argue that Defendant's experiments do not follow Kawata's methodology precisely, and that, as a result, the experiments cannot prove that Kawata inherently embodies a solubilizer. Plaintiffs' Reply Memorandum at 35–38. However, even assuming that Defendant's experiments followed Kawata's disclosures closely, Defendant's evidence still cannot fulfill the legal requirements for inherency, namely, that a person of ordinary skill in the art would recognize that PEG 400 necessarily functions as a claimed solubilizer in Kawata. *Id.* at 38.

**[A] *Nature of Defendant's Evidence***

As discussed above in Part VI(D), this Court will preclude Defendant from presenting certain untimely evidence related to Kawata, which was not properly disclosed during discovery. However, as shown below, even if this Court were to allow Defendant to introduce all of its evidence on Kawata, Defendant still cannot show the inherent presence of a solubilizer in the Kawata invention.

In his sworn declaration, Professor Richard B. Silverman, Ph.D., an expert witness for Defendant, states that in his opinion, "PEG 400 increases the solubility of nifedipine in [DCM]." Declaration of Richard B. Silverman, Ph.D. ¶ 9. Based on Dr. Silverman's experiments, Dr. R. Christian Moreton, another expert for Defendant, states his conclusion that the PEG 400 in the Kawata process "would function to increase the solubility of nifedipine in DCM." Declaration of R. Christian Moreton, Ph.D. ¶ 55 (5/30/03). The purpose of Defendant's experiments was to compare the solubility of nifedipine in DCM, in the absence of PEG 400, to the solubility of nifedipine in DCM when PEG 400 is included in the composition. Declaration of Richard B. Silverman, Ph.D. ¶ 4. The result of Defendant's first experiment was that the nifedipine was approximately 25% more soluble (in DCM) in the presence of PEG 400, than in the absence of PEG 400. *Id.* ¶ 9. Defendant conducted various other experiments, which, Defendant's experts contend, prove that PEG 400 increases the solubility of nifedipine in DCM. These experimental proofs fall far short of demonstrating that a solubilizer element is inherent in Kawata.

**[B] *Requirements for a Showing of Inherency***

The Federal Circuit issued its latest statement on the law of inherent anticipation on August 1, 2003. *Schering Corp. v. Geneva Pharmaceuticals,* No. 02–1540, 339 F.3d 1373, 2003 WL 21767852 (Fed.Cir.

Aug. 1, 2003). In *Schering*, the Court of Appeals confirmed that inherent anticipation does not require "recognition" in the prior art, but only recognition at a "later" time. *Id.*, at *2.

The prior inherency cases were consistent regarding the basic meaning of the doctrine of inherency; that is, a prior art reference may anticipate the patent in suit without expressly disclosing a certain feature of the patent in suit if that missing characteristic is "necessarily present," or "inherent," in the anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed.Cir.1991).

Yet, certain Federal Circuit cases have referred to inherency as a two-prong determination, requiring not only "that the missing descriptive matter is *necessarily present* in the thing described in the reference, [but also] that it would be so *recognized* by persons of ordinary skill." *Id.* (emphasis added). One issue is whether the party claiming anticipation must show that a skilled artisan would have recognized the inherent characteristic before the issuance of the patent in suit, or whether it is sufficient to show that a skilled artisan would recognize the characteristic in the prior art at the time of the litigation, given all the benefits of hindsight and advancement in scientific knowledge.

Indeed, as recently as August 2002, a panel of the Federal Circuit actually stated that when anticipation is based on inherency, "it must be shown that the undisclosed information *was known to be present* in the subject matter of the reference." *Elan Pharmaceuticals, Inc. v. Mayo Found.*, 304 F.3d 1221, 1228 (Fed.Cir.2002) (emphasis added) (citing *Continental Can*, 948 F.2d at 1269), *reh'g en banc granted, opin-*

*ion vacated,* 314 F.3d 1299 (Fed.Cir.2002). The Federal Circuit, *en banc,* later vacated that panel decision. 314 F.3d at 1299.

The case of *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342 (Fed.Cir.1999), heavily relied upon by Defendant in its present motion papers, added some clarity to the "recognition" issue. In *Atlas Powder*, the district court, following two separate bench trials, found that the plaintiff's patent was invalid as anticipated by the prior art, and the Federal Circuit affirmed. Although the "sufficient aeration" element of the plaintiff's patent was not explicitly stated in the prior art, sufficient evidence at trial demonstrated that the missing element was inherent in the prior art. *Id.* at 1347. The plaintiff argued on appeal that the missing element could not be present in the prior art because there was no evidence, in the total body of prior art, to suggest that persons of ordinary skill in the art would have recognized the presence of that element in the anticipating reference. *Id.* at 1349. The *Atlas Powder* court explained that

> Because "sufficient aeration" was inherent in the prior art, it is *irrelevant that the prior art did not recognize* the key aspect of [the plaintiff's invention]—that air may act as the sole sensitizer of the explosive composition. An inherent structure, composition, or function is *not necessarily known.* . . . *Insufficient prior understanding* of the inherent properties of a known composition does not defeat a finding of anticipation.

*Id.* at 1348–49 (emphasis added). The court also observed that inherency "is not necessarily coterminous with the knowledge of those of ordinary skill in the art." [10] *Id.* at 1347.

---

**10.** The Federal Circuit in *Atlas Powder* also noted that a prior art reference may inherently contain a certain feature even though that

prior art reference "teaches away" from the feature in question. *Id.* at 1349. The fact that the author of the prior art reference

The *Schering* court held that a finding of inherent anticipation does not require proof that a skilled artisan would have recognized the inherent characteristic in the prior art. *Schering*, 339 F.3d 1373, 2003 WL 21767852, at *4. Specifically, the Federal Circuit ruled that recognition by a person of ordinary skill in the art, before the date of the patent in suit, is not required. *Id.*, at *2. Rather, inherency may be shown by evidence of "later recognition" of the inherent characteristics of the prior art. *Id.*

In the instant case, Defendant has proffered no evidence of "recognition" of an inherent solubilizer in Kawata, either in 2003, or at any earlier time. Defendant's proofs (even including the evidence which this Court has excluded on procedural grounds) nowhere demonstrate that a person of ordinary skill in the art, even with the benefit of hindsight, would recognize an inherent solubilizer in Kawata. All that Defendant has done is set up experiments which its experts contend show Kawata's solubilizer function. Defendant cites unpublished authorities. But persons of ordinary skill in the art would not have access to Defendant's data. Indeed, Defendant's experiments were undertaken only for purposes of this litigation (and are even subject to a protective order by this Court); thus, artisans in this field, without having observed such experiments, or having learned of their results afterward, would not reasonably be expected to "recognize" that which is purportedly proven by such experiments.

Nor has Defendant shown, by clear and convincing evidence, that a solubilizer function is "necessarily" present in the Kawata invention. Defendant's experimental evidence and expert declarations raise only a question of probabilities as to whether a solubilizer component is inherent in Kawata. Defendant's experts were obviously looking for evidence of a solubilizer function in Kawata (having been asked by Defendant to perform experiments directed to that hypothetical function), whereas another person of ordinary skill in the art would not have approached Kawata with the possibility of a solubilizer function already in mind.

As discussed in Part VI(D), *supra*, this Court has determined that Defendant should not be permitted to introduce certain expert reports and experimental data that were not timely disclosed per the Court's scheduling orders. It is important to note that, whether or not such new evidence is considered, Defendant cannot succeed in its inherency argument. Defendant's prior, and timely, expert reports cite various experiments in support of the conclusion that PEG 400 increases the solubility of a substance (i.e. nifedipine) in another substance (i.e. water). Reply Expert Report of Richard B. Silverman, Ph.D. ¶ 26. The new evidence only expands on this theory, by showing that, under certain laboratory conditions created by Defendant, PEG 400 acted as a solubilizer. But this new evidence still would not show that a solubilizer is always and "inevitably" present in the Kawata

believed a certain element was not required for the prior art invention to work does not mean that the element was, in fact, not present in the prior art invention. The prior art reference's author could simply have been ignorant of that element's inherent presence in the prior art device. *Id. See also MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed.Cir.1999) ("Where ... the result is

a necessary consequence of what was deliberately intended, it is of no import that the [prior art] article's authors did not appreciate the [inherent] results."). In the instant case, the fact that Kawata "teaches away" from the use of a solubilizer, with respect to at least one of its embodiments, cannot support a finding that a solubilizer is not inherently present in Kawata.

invention. *Atlas Powder*, 190 F.3d at 1348.

### iii.) *Defendant's "Nose of Wax" Argument*

Defendant further asserts that its own proposed manufacturing process, which has been found by this Court to infringe the '081 patent, employs exactly the same process as Kawata. So, the argument goes, if Defendant's process infringed the '081 patent, Kawata must anticipate the '081 patent. As noted above, for purposes of determining issues of invalidity, this Court must adopt the same construction of the '081 patent's claims as it adopted in deciding the infringement issue. *Amgen Inc., supra*, 314 F.3d at 1330. Defendant stresses that a court may not interpret a patent one way to find infringement, and, like a "nose of wax," interpret the patent another way to avoid anticipation. *E.g. Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed.Cir.2001). But this argument must fail because, as shown above, Defendant cannot demonstrate the explicit or inherent presence of a solubilizer in Kawata. By contrast, both the '081 patent and Defendant's infringing products contain a solubilizer. *AstraZeneca AB v. Mutual Pharm. Co., Inc.*, 250 F.Supp.2d 506 (E.D.Pa.2003).

In sum, because Defendant cannot establish that the Kawata patent contains a solubilizer, Defendant will be unable to prove that Kawata anticipates claim 1 of the '081 patent. Nor can Defendant demonstrate that Kawata anticipates claims 8, 12, 14 or 15 of the '081 patent, which are dependent on claim 1. Independent claim 17, which describes the process taught by the '081 patent, also, of course, requires a solubilizer. Because Kawata's process does not, explicitly or inherently, make use of a solubilizer, Kawata cannot anticipate claim 17. Therefore, Defendant cannot establish that the Kawata patent anticipates any of the asserted claims of the '081 patent.

### 2. *If the Court Considered Defendant's Evidence on the German '106 Patent, It Would Possibly Result in a Genuine Issue of Material Fact*

For the reasons discussed above, in Part VI(C), this Court precludes Defendant from introducing evidence related to the German '106 patent, because of the multiple incidents of untimeliness of Defendant's disclosure of its intention to rely on that patent, and its presentation of supporting evidence, to the prejudice of Plaintiffs. However, a review of Defendant's evidence on the German '106 patent, without considering arguments Plaintiffs might have made if Plaintiffs had known of this issue during discovery, indicates that the issue possibly creates a genuine issue of material fact.

Defendant's evidence would have been important, as can be seen from a simple comparison of the German '106 patent to Plaintiffs' '081 patent, shown below.

Defendant argues that the German '106 patent contains every element of claim 1 (as well as claims 12, 14 and 15) of the '081 patent. As noted above, the inventor of the '081 patent referred to the German '106 patent in the Background section of the '081 patent, but attempted to distinguish it from the '081 patent. United States Patent 4,803,081 (col.1, lns.62–64).

Claim 1 of the '081 patent (upon which claims 12, 14 and 15 are dependent) comprises several limitations relevant to this anticipation analysis:

> a solution or dispersion of an effective amount *of the active compound in* a semi-solid or liquid nonionic *solubilizer*, wherein the amount by weight of the solubilizer is *at least equal* to the

amount by weight of the active compound, and a *release controlling system* to provide extended release.

*Id.* (claim 1) (emphasis added). Defendant claims that the German '106 patent contains each of these elements, thereby anticipating claim 1. The May 30, 2003 Declaration of one of Defendant's experts, Dr. Moreton, explains Defendant's reliance on the German '106 patent in demonstrating anticipation. As noted above, Plaintiffs have not had a fair opportunity to challenge Dr. Moreton's opinion on this topic.

Dr. Moreton verifies that the German '106 patent contains an "active compound" element, as required by the '081 patent. In Example 8 of the German '106 patent (an example to which the parties direct much attention) the active compound is flufenamic acid, which has very low solubility in water. Declaration of R. Christian Moreton, Ph.D. ¶ 34 (5/30/03). Example 8 states the following: "Eudispert hv® was dissolved in 90 g of PEG 600 at 100 to 120 C. 200–mg flufenamic acid was added to 0.3 g of this mixture, and the substance was placed in 0.5 g forms." German patent DE 3400106 A1 (Example 8).

Defendant's expert opines that the German '106 patent discloses a "nonionic solubilizer," as that term is used in the '081 patent, per this Court's claim construction. Declaration of R. Christian Moreton, Ph.D. ¶ 32 (5/30/03). According to the expert, in Example 8 of the German '106 patent, this solubilizer is PEG 600, but other solubilizers are used in different examples within the German '106 patent. *Id.* ¶¶ 32–34. The inventor of Plaintiffs' '081 patent also apparently recognized that the German '106 patent contains a solubilizer. United States Patent 4,803,081 (col.1, lns.62–64).

Next, Dr. Moreton states that, in his understanding, the German '106 patent contains a release controlling system providing an extended release function. Dec-

laration of R. Christian Moreton, Ph.D. ¶ 32 (5/30/03). The expert opines that in Example 8 of the German '106 patent, such extended release function is performed by Eudispert, a polyacrylate derivative. *Id.* ¶ 33.

Finally, it is an important limitation of claim 1 of the '081 patent that the amount by weight of the solubilizer must be at least equal to the amount by weight of the active compound. The '081 patent inventors attempted to distinguish the German '106 patent on the ground that, in that foreign patent, the ratio of solubilizer to active compound is less than 1:1, by weight. United States Patent 4,803,081 (col.1, lns.62 64) (stating that the German '106 patent "is described to use a solubilizer in an amount by weight to the active compound which is much less than 1:1"). But Defendant argues, and its expert opines, that Example 8 of the German '106 patent actually discloses a formulation in which the amount of solubilizer, PEG 600, is greater than the amount of active compound, flufenamic acid, such that the German '106 patent adheres to the weight ratio limitation of claim 1. Def. Reply at 49; Declaration of R. Christian Moreton, Ph.D. ¶ 34 (5/30/03). Example 8 utilizes 90 g of PEG 600 and 200 mg of flufenamic acid, prior to mixing.

Thus, according to Defendant's expert, the German '106 patent discloses virtually every limitation required by claim 1 of the '081 patent. In this regard, Dr. Moreton's opinion is both unequivocal and apparently supported by the text of the foreign patent itself.

Plaintiffs' reply brief, pp. 45–48, substantively disputes Defendant's argument, first that there is no indication that Example 8 provides a solid dosage form, and second that the nonionic solubilizer element is not taught by the German '106 Example 8. On the face of this patent,

Plaintiffs have a sound argument. However, the Moreton Declaration, reviewed above, if it were allowed, creates a fact issue because he asserts that, in Example 8, PEG 600 is and acts as a nonionic solubilizer. Plaintiffs also assert that Defendant's evidence does not meet the required heightened burden; this may be true in a trial context, but this Court would not so rule as a matter of law on summary judgment.

This Court has set forth this explanation of Defendant's evidence and arguments so that a reviewing court may evaluate the relevancy of the excluded evidence, and if appropriate, Plaintiffs may offer arguments relevant on the issue.

### B. *Obviousness*

■■■ As explained above, a party asserting that the patent in suit is rendered obvious by the prior art must show some "teaching, suggestion, or reason" in the prior art that would lead one of ordinary skill in the art to combine the various prior art references. *Winner, supra*, 202 F.3d at 1348. The absence of such a suggestion to combine is dispositive in an obviousness inquiry. *Gambro Lundia, supra*, 110 F.3d at 1579.

In its briefs, Defendant makes a combinability argument with respect to claims 14 and 15 of the '081 patent (both of which claims refer to hydroxypropyl methylcellulose ("HPMC")). Def. Brief at 38–41. Defendant cites to the Schor patent and the Alderman article in an attempt to show that certain limitations of claims 14 and 15 would have been obvious to a person of ordinary skill in the art.

But nowhere in any of its papers does Defendant make a "clear and particular" showing of combinability with respect to the critical "solubilizer" limitation of the '081 patent. *Winner*, 202 F.3d at 1349. If the prior art does not render that element

obvious, then it is of no matter whether or not certain other elements (i.e. pertaining to HPMC) were obvious. Accordingly, Defendant cannot prevail on its obviousness theory, and this Court will grant partial summary judgment for Plaintiffs as to that aspect of Defendant's invalidity case.

## VIII. Conclusion

For the reasons stated above, this Court will grant Plaintiffs' Motion to Exclude, will grant Plaintiffs' Motion for Summary Judgment, and will deny Defendant's Motion for Summary Judgment. An appropriate Order follows.

### ORDER

AND NOW, this day of August, 2003, it is hereby ORDERED that:

1. Plaintiffs' Motion to Exclude is GRANTED;

2. Plaintiffs' Motion for Summary Judgment Dismissing Mutual's Affirmative Defense and Counterclaim of Invalidity of the Asserted Claims of U.S. Patent 4,803,081 is GRANTED;

3. Defendant's Motion for Summary Judgment of Invalidity of U.S. Patent 4,803,081 is DENIED; and

4. Final judgment is entered in favor of Plaintiffs and against Defendant.